# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

          Plaintiff,

v.

          Case No. 22-CR-210-JPS

MAURICE GEONTA DAVIS,

          **ORDER**

          Defendant.

## 1.    INTRODUCTION

Currently before the Court is Defendant Maurice Geonta Davis's ("Defendant") motion to dismiss the single-count Indictment against him, in which he is charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) (hereinafter "§ 922(g)(1)"). ECF No. 28.[1] Defendant argues that the charge offends the Second Amendment of the United States Constitution under the analytical test the Supreme Court pronounced in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. ___, 142 S. Ct. 2111 (2022) (hereinafter "*Bruen*"). The motion is fully briefed. ECF

---

[1]ECF No. 28 is Defendant's original motion, which requests both leave to file instanter a Second Amendment-based motion to dismiss, and "an Order . . . conducting a historical analysis of 18 U.S.C. [§] 922(g)(1) to determine whether or not this Statute applies anymore to . . . Defendant, . . . and if not, to dismiss the present Indictment against him." ECF No. 28 at 3.

    The Court effectively granted Defendant's motion for leave to file instanter. ECF No. 34 (overruling Magistrate Judge William E. Duffin's denial of Defendant's motion for leave to file instanter his motion to dismiss, and setting a schedule for supplemental briefing). Therefore, the issue now before the Court is resolving Defendant's argument for dismissal of the Indictment.

Nos. 39, 41, 43.[2] For the reasons stated herein, Defendant's motion to dismiss will be denied.

## 2.     RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

In March 2023, Defendant, his prior attorney, and the attorney for the Government submitted a signed plea agreement. ECF Nos. 18, 23. However, on June 7, 2023, at a plea colloquy pursuant to Federal Rule of Criminal Procedure 11, Defendant's prior attorney indicated that Defendant would "not be going through with [a] Change of Plea hearing"

---

[2]Defendant, acting pro se, submitted his own supplementary and reply briefs. ECF Nos. 42, 44. As the Court previously warned Defendant, this was improper, and the Court will disregard the submissions. ECF No. 34 at 2 n.1 ("Defendant himself filed objections to Judge Duffin's order . . . . ECF No. 31 . . . . Defendant has neither sought nor been granted the privilege of hybrid representation.") (citing *United States v. Chavin*, 316 F.3d 666, 671–72 (7th Cir. 2002)); *see also Chavin*, 316 F.3d at 671–72 (collecting cases in support of the propositions that "there is no Sixth Amendment right to hybrid representation," that the district court has discretion over "whether a defendant may act as co-counsel along with his own attorney," and that granting hybrid representation is "disfavored") (citing *United States v. Kosmel*, 272 F.3d 501, 506 (7th Cir. 2001) and *Cain v. Peters*, 972 F.2d 748, 750 (7th Cir. 1992) and quoting *United States v. Oakey*, 853 F.2d 551, 553 (7th Cir. 1988)).

Further, because Defendant has already been warned once against making pro se submissions while represented by counsel, the Court will strike the submissions. If Defendant wants to bring an issue to the Court's attention, he must do so through his attorney.

Defendant avers that he did not receive a copy of the Government's opposition brief until his attorney mailed one to him along with a copy of the reply brief and therefore was delayed due to "manipulation of the mail process and having inadequate access to a proper search engine to be properly notified of such reply by the Government." ECF No. 44 at 1. Defendant argues that this "raises colorable ethical concerns," "circumvent[ed] [his] right to participate in the process," and/or is "counter-productive to the central goal of Due Process." *Id.* Even accepting Defendant's version of the facts as true, these arguments are without merit, on *Chavin*'s rationale: because the Court has not permitted Defendant to proceed with hybrid representation, the Court is not obligated to consider his pro se filings, nor was the Government required to serve a copy of its opposition brief on anyone besides Defendant's attorney of record.

Case 2:22-cr-00210-JPS   Filed 02/08/24   Page 2 of 33   Document 45

and "request[ed] to withdraw from representing [D]efendant." ECF No. 25 at 1. Magistrate Judge Duffin granted the motion to withdraw, and new counsel—who brought the instant motion to dismiss—appeared for Defendant on June 8, 2023. ECF Nos. 24, 25, 26. Due to the pendency of the instant motion to dismiss, no further plea colloquy has been held or scheduled, and the Court has not formally accepted the plea agreement. Although Defendant has not formally moved to withdraw his plea agreement, the not guilty plea he entered at his initial appearance, ECF No. 3, remains in effect.

As mentioned previously, Defendant faces a single charge of being a felon in possession of a firearm.[3] Defendant has several prior state felony convictions. *See* ECF No. 22 (pre-plea criminal history investigation); ECF No. 39 at 17–21 (outlining Defendant's "prior record"). His first state felony conviction was for escape from home confinement in 1997. ECF No. 22 at 2. In 1998, at seventeen years old, he was convicted of, inter alia, felony battery to a law enforcement officer and possession of a firearm by a felon. *Id.* at 3. In 2004, he accrued a misdemeanor battery conviction for fighting in jail. *Id.* at 4–5. In 2006, he was again convicted of felony possession of a firearm by a felon; in that case, after law enforcement officers attempted to make contact with him about complaints of drugs being sold in the area, Defendant fled from police and tossed a loaded handgun aside as he did so. *Id.* at 5.

---

[3]A fuller description of the facts underlying this case is available both in the plea agreement, ECF No. 18 at 3–4, and in the Government's opposition brief, ECF No. 41 at 1–2. Defendant does not oppose the facts as summarized by the Government. *See generally* ECF Nos. 39 and 43. Because Defendant is raising a challenge to the single charge in the Indictment, despite having agreed to plead guilty to it and to the factual basis therefor, the Court does not recite the facts underlying the charge and takes no position on them at this time.

Case 2:22-cr-00210-JPS    Filed 02/08/24    Page 3 of 33    Document 45

In addition to his state offenses, Defendant has a prior federal felony conviction for conspiracy to distribute at least twenty-eight grams of cocaine base. *United States v. Maurice Geonta Davis*, Case No. 11-CR-63-6 (E.D. Wis.). He ultimately served a 110-month sentence and was on supervised release in that matter when he committed the offense charged in this case. *Id.* at ECF No. 261 (original judgment of conviction); *id.* at ECF No. 310 (amended judgment of conviction); *id.* at ECF Nos. 386, 388, and docket entry dated November 7, 2022 (showing that Defendant was arrested for alleged violations of the terms of his supervised release, but that the final revocation hearing in that matter has been held in abeyance until this prosecution is resolved).

### 3.    LEGAL STANDARD

#### 3.1    Motion to Dismiss

As a threshold matter, the Court must set right a prior misunderstanding. In overruling Magistrate Judge Duffin and allowing Defendant's Second Amendment-based motion to dismiss to proceed, *see supra* note 1, the Court adopted Defendant's characterization of his challenge as one pertaining to subject matter jurisdiction, and therefore appropriate for resolution regardless of the point to which the prosecution had progressed. ECF No. 34 at 3–4 (citing Fed. R. Crim. P. 12(b)(2)) (reasoning that "[i]f the statute under which Defendant is charged in the single-count Indictment is deemed inconsistent with the Second Amendment, there will be no charge in the present charging document over which the Court can exercise subject matter jurisdiction"). The Court did so without considering whether Defendant's motion was a facial or an as-applied challenge to § 922(g)(1). It appears that Defendant proceeds only on an as-applied challenge. *See* ECF No. 28 at 1, 3 (asking the Court to analyze

"the applicability of this Statute as to the Defendant" and to "determine whether or not this Statute applies anymore to the Defendant"); ECF No. 39 at 15 ("The Government has not met its burden of proof that . . . [this statute] applies to the defendant."); ECF No. 43 at 6 (Defendant's reply brief stating that his "position is that <u>he</u> retains his Second Amendment rights based upon <u>his</u> personal characteristics and history, and the facts of his case"). His briefing addresses only the facts of his own case and does not address "any set of hypothetical facts under which the statute might be unconstitutional." *United States v. Phillips*, 645 F.3d 859, 863 (7th Cir. 2011) (citing *United States v. Sandsness*, 988 F.2d 970, 972 n.2 (9th Cir. 1993) and *United States v. Stephenson*, 557 F.3d 449, 456 (7th Cir. 2009)). On the other hand, the Government has construed Defendant's motion as raising both facial and as-applied challenges. *See generally* ECF No. 41.

The Seventh Circuit "ha[s] left room for as-applied challenges to" § 922(g)(1), *Kanter v. Barr*, 919 F.3d 437, 443 (7th Cir. 2019), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111, and courts in this District have entertained as-applied challenges post-*Bruen*. *See, e.g.*, *United States v. Johnson*, No. 22-CR-254, 2023 WL 7284848, at *7–8 (E.D. Wis. Nov. 3, 2023).

The distinction between facial and as-applied challenges matters for reasons of timeliness. "While a facial attack on a statute's constitutionality is jurisdictional, an as-applied . . . challenge is not . . . . Unlike a facial challenge, an as-applied challenge does not dispute the court's power to hear cases under the statute; rather, it questions the court's limited ability to enter a conviction in the case before it." *Phillips*, 645 F.3d at 863 (citations omitted). In other words, a facial constitutional challenge is suited for resolution as a matter of the Court's jurisdiction under Federal Rule of Criminal Procedure 12(b)(2) and accordingly can be "made at any time

while the case is pending." Conversely, an as-applied challenge, like Defendant's, may be better suited for resolution under Federal Rule of Criminal Procedure 12(b)(3)(B)(v), which allows a defendant to move "before trial" to dismiss a charge for "failure to state an offense." *See, e.g., United States v. Posey*, 655 F. Supp. 3d 762, 766 (N.D. Ind. 2023). Defendant's counsel did not appreciate or explain this difference, instead continuing to press the argument that the challenge *had* to be heard as a jurisdictional matter and that therefore timing was irrelevant. The Government similarly did not point out the error. The Court then, unfortunately, repeated the error in addressing Defendant's initial request for leave to file a Second Amendment-based motion to dismiss.

The error is ultimately of no consequence, however, as the decision of whether to review an untimely pretrial motion is committed to the discretion of the trial court. *United States v. Salahuddin*, 509 F.3d 858, 860–61 (7th Cir. 2007) (citing *United States v. Coronado-Navarro*, 128 F.3d 568, 572 (7th Cir. 1997) and *Brooks v. United States*, 64 F.3d 251, 256–57 (7th Cir. 1995)) (vacating judgment and remanding case so that defendant could litigate his motion to suppress). Further, although "facial and as-applied challenges can overlap conceptually," for the reasons explained below, "the Court does not find merit in [Defendant's] arguments on the whole, whether cast as as-applied or facial," so the distinction is less important. *United States v. Tollefson*, 367 F. Supp. 3d 865, 872 (E.D. Wis. 2019) (citing *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) and *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 475 (7th Cir. 2012)).

Under these circumstances, the Court finds it most appropriate to decide Defendant's motion on its merits. The Court agrees with Magistrate Judge Duffin that Defendant's explanation for why his motion could not

have been brought earlier is unconvincing—*Bruen* was decided several months before Defendant was indicted, and Defendant had ample time to bring such a challenge by the original pretrial motions deadline; he needn't have waited until the Seventh Circuit's decision in *Atkinson v. Garland*, 70 F.4th 1018, 1020 (7th Cir. 2023) to bring his motion. ECF No. 29 at 2–3. But the Court nonetheless finds that it is most efficient to decide Defendant's motion on its merits at this juncture and thus enable this case to reach its conclusion promptly. Additionally, the Government did not argue that it, its witnesses, or any victims in this case would be prejudiced by resolving the merits of the motion to dismiss. *See generally* ECF No. 32; *compare Salahuddin*, 509 F.3d at 862 (finding that a pretrial motion should be entertained where "neither the speed and efficiency of the judicial process nor fairness to the Government appears to be at stake" and where "the Government makes no argument that it would have been prejudiced" by consideration of the motion) *with United States v. Suggs*, 703 F. App'x 425, 428 (7th Cir. 2017) (affirming denial of leave to file untimely motion because "[j]udicial efficiency and fairness to the government and victims were at stake by entertaining the belated motion").

Although this issue is ultimately just water under the bridge, the Court sets the record straight now so as to preclude defendants in other cases from making the same argument that Defendant did to justify an otherwise-untimely pretrial motion. The Court regrets its error but will not repeat it in future cases.

With that knot untangled, the Court can now set out the proper legal standard for a pretrial motion. A defendant may move to dismiss an indictment on the basis that it "fail[s] to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v). "A defendant can make such a motion on the basis that the

charged offense is based on an unconstitutional statute." *Posey*, 655 F. Supp. 3d at 766 (citing *United States v. Holden*, 638 F. Supp. 3d 931, 935–36 (N.D. Ind. 2022)) (examining a defendant's pretrial motion that brought both as-applied and facial challenges to 18 U.S.C. § 922(g)(3)).

The Court next discusses recent developments in Second Amendment jurisprudence before applying the law as it now stands to Defendant's motion to dismiss.

### 3.2 The Second Amendment and Pre-*Bruen* Case Law

The Second Amendment to the United States Constitution provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. AMEND. II. In a pair of seminal cases, the United States Supreme Court held that the Second Amendment, as applied to the states through the Fourteenth Amendment, protects the right of individuals to possess handguns in the home for self-defense. *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. Chicago*, 561 U.S. 642 (2010).

Under *Heller* and *McDonald*, lower courts analyzing Second Amendment challenges followed a two-step inquiry. First, they engaged in a "textual and historical inquiry" to determine "whether the regulated activity [fell] within the scope of the Second Amendment." *Ezell v. Chicago*, 846 F.3d 888, 892 (7th Cir. 2017) (citing *Ezell v. Chicago*, 651 F.3d 684, 701–02 (7th Cir. 2011)). If the regulated activity was "outside the scope of the right as originally understood, then 'the regulated activity [was] categorically unprotected'" and did not offend the Second Amendment. *Id.* (quoting *Ezell*, 651 F.3d at 703). If "historical evidence [wa]s inconclusive or suggest[ed] that the regulated activity [wa]s *not* categorically unprotected," then the analysis shifted to examining "the strength of the government's

Case 2:22-cr-00210-JPS   Filed 02/08/24   Page 8 of 33   Document 45

justification for restricting or regulating the exercise of Second Amendment rights" and "the regulatory means the government [had] chosen" against "'the public-benefits end it s[ought] to achieve.'" *Id.* (quoting *Ezell*, 651 F.3d at 703). This second step became known as "means-end" analysis.

The *Heller* and *McDonald* rulings were not unqualified. The *Heller* majority noted that "the right secured by the Second Amendment is not unlimited," explaining that, "[a]lthough we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons . . . ." 554 U.S. at 626. The *McDonald* court "repeat[ed] th[is] assurance[]." 561 U.S. at 786 (quoting *Heller* at 626–27).

### 3.3 The Post-*Bruen* Standard

In *Bruen*, the Supreme Court rejected "means-end" analysis and instead directed lower courts to utilize a history-driven standard for evaluating whether a regulation is consistent with the Second Amendment.

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Bruen*, 142 S. Ct. at 2129–30 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49 n. 10 (1961)).[4]

---

[4]Judge Griesbach summarized the *Bruen* court's rationale as follows:

The Court's rejection of the "means-end" analysis reflects the majority's view that the basic right to bear arms could not be dependent on legislative or judicial sufferance. In other words, the

*Bruen* sets out two analytical approaches for courts "to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 2131. First,

> when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Id.* Second, in "other cases implicating unprecedented societal concerns or dramatic technological changes," courts may need to take "a more nuanced approach." *Id.* at 2132. This entails "reason[ing] by analogy from relevantly similar regulations that were in existence at the relevant time." *Watson*, 2023 WL 6623774, at *3 (citing *Bruen*, 142 S. Ct. at 2132). The *Bruen* court further explained that

---

> mere fact that firearms have the capacity to harm people and the government has a strong interest in protecting people from harm cannot justify depriving law-abiding citizens of the right to bear arms. As the Court noted in *Heller*, "[a] constitutional guarantee subject to future judges' assessment of its usefulness is no constitutional guarantee at all." 554 U.S. at 634. Instead, the Court concluded that the Second Amendment's text and the historical understanding surrounding it constitute the true measure of the contours of the right the constitution was intended to protect.

*United States v. Watson*, No. 23-CR-109, 2023 WL 6623774, at *2–3. (E.D. Wis. Oct. 11, 2023).

Case 2:22-cr-00210-JPS   Filed 02/08/24   Page 10 of 33   Document 45

[w]hile we do not now provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment, we do think that *Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense. As we stated in *Heller* and repeated in *McDonald*, individual self-defense is the *central component* of the Second Amendment right . . . . Therefore, whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are *central* considerations when engaging in an analogical inquiry.

To be clear, analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check. On the one hand, courts should not "uphold every modern law that remotely resembles a historical analogue," because doing so "risk[s] endorsing outliers that our ancestors would never have accepted." *Drummond v. Robinson*, 9 F.4th 217, 226 ([3d Cir.] 2021). On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.

*Bruen*, 142 S. Ct. at 2132–33 (citations to and quotation marks from *Heller* and *McDonald* and footnote omitted); *see also Atkinson*, 70 F.4th at 1023–24 (naming five "interrelated and non-exhaustive questions" to guide the *Bruen* analysis).

The *Bruen* majority sustained the petitioner's challenge to a state law that required individuals who wanted to carry a firearm outside the home to show "proper cause" to obtain a license to do so. *Bruen,* 142 S. Ct. at 2122–23. It found that the state law lacked historical grounding and thus did not survive scrutiny, while noting that "[t]he Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public *subject to*

*certain reasonable, well-defined restrictions.*" *Id.* at 2156 (quoting *Heller*, 554 U.S. at 581) (emphasis added). Three concurring justices further expounded on this caveat. In a concurring opinion, Justice Kavanaugh, joined by Chief Justice Roberts, repeated the *Heller* majority's instruction that "[n]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons . . . ." *Id.* at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 626–27). Justice Alito clarified that "[o]ur holding decides nothing about who may lawfully possess a firearm . . . ." *Id.* at 2157 (Alito, J., concurring).[5]

### 3.4 In-Circuit Applications of *Bruen* to § 922(g)(1)

The Seventh Circuit has not ruled on whether § 922(g)(1) complies with the Second Amendment's commands following *Bruen*. *See Atkinson*, 70 F.4th at 1020 (remanding case "to allow the district court to undertake the *Bruen* analysis in the first instance").[6] But Defendant's Second Amendment-based motion to dismiss the Indictment is not the first in this circuit, or even

---

[5]In *Bruen*, the Supreme Court also explicitly recognized that the Second Amendment, as construed in *Heller* and *McDonald*, protects not only the right to have a gun in the home, but also "protect[s] an individual's right to carry a handgun for self-defense *outside* the home." 142 S. Ct. at 2122 (emphasis added). Defendant emphasizes this point in his opening brief. ECF No. 39 at 12 ("[T]he plain text of the Second Amendment protects carrying handguns publicly for self defense."). But the Government does not appear to dispute that the nature of Defendant's conduct in this case—carrying a handgun with him in his vehicle, *see* ECF No. 41 at 1—is within the ambit of the Second Amendment as construed in *Heller*, *McDonald*, and *Bruen*.

[6]The Seventh Circuit has found in two cases that the district court committed no plain error in finding § 922(g)(1) constitutional. *United States v. Miles*, 86 F.4th 734, 739–40 (7th Cir. 2023); *United States v. Williams*, No. 22-2841, 2023 WL 8251313, at *2 (7th Cir. Nov. 29, 2023). However, these cases bear little weight in the present analysis because the defendants in those cases raised their Second Amendment challenges only on appeal, so the district courts can hardly be said to have "found" the statute constitutional under the *Bruen* standard.

in this District. Presently, there is no consensus on the issue among the district courts of the Seventh Circuit. *See, e.g.*, *United States v. Hardy*, No. 23 CR 129, 2023 WL 6795591 (N.D. Ill. Oct. 13, 2023) (finding § 922(g)(1) constitutional) *and United States v. Rice*, No. 3:22-CR-36 JD, 2023 WL 2560836 (N.D. Ind. Mar. 17, 2023) (same); *but see, e.g.*, *United States v. Daniel*, No. 20 CR 002, 2023 WL 7325930 (N.D. Ill. Nov. 7, 2023) (finding § 922(g)(1) unconstitutional as applied to the defendant).

   As far as this Court is aware, two district judges and two magistrate judges in this District have now addressed the question, and all have rejected such challenges. *Watson*, 2023 WL 6623774; *Johnson*, 2023 WL 7284848; *United States v. Denruyter*, No. 23-CR-155, 2023 WL 8098783 (E.D. Wis. Oct. 17, 2023), *report and recommendation adopted*, No. 23-CR-155, 2023 WL 8081658 (E.D. Wis. Nov. 21, 2023); *see also United States v. Derrick Davis*, Case No. 22-CR-189, ECF No. 31 (E.D. Wis. Feb. 27, 2023) (report and recommendation from Magistrate Judge Stephen C. Dries recommending that the defendant's Second Amendment-based motion to dismiss be denied), *motion to dismiss denied as moot due to defendant's guilty plea, id.* at ECF No. 44 (E.D. Wis. May 5, 2023).

**4.     ANALYSIS**

   As noted above in Section 3.1, the Court understands Defendant's motion to raise only an as-applied challenge to § 922(g)(1) and understands the Government's response to construe Defendant's motion as raising both facial and as-applied challenges. An as-applied challenge "charges [that] an act is unconstitutional as applied to a [party's] specific activities even though it may be capable of valid application to others." *Surita v. Hyde*, 665 F.3d 860, 875 (7th Cir. 2011) (citing *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 803 (1984)). In the Second Amendment context, this

requires the Government to show that § 922(g)(1), as applied to Defendant, "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," *Bruen*, 142 S. Ct. at 2127, before it may seek to penalize him for possessing a firearm.

The Government argues that § 922(g)(1) "remains a permissible restriction on firearms possession because felons do not fall within the textual purview of the Second Amendment," and that "[e]ven if they did, § 922(g)(1) remains constitutional because the statute is consistent with this nation's historical tradition of categorically prohibiting firearm possession by untrustworthy adherents to the law and of punishing felons through capital punishment and estate forfeiture." ECF No. 41 at 6. Turning to Defendant's as-applied challenge, the Government further stresses that the constitutionality of § 922(g)(1) does not "turn[] on individualized assessment" but, even if it did, "Defendant has dangerous and violent prior felony convictions" and "therefore . . . is among the class of individuals constitutionally prohibited from possessing firearms . . . ." *Id.* at 20–21. The Court takes up each argument in turn.

### 4.1 Plain Text

As noted above, the Government first argues that the possession of firearms by individuals convicted of felonies, such as Defendant, falls outside the Second Amendment's plain text, and that therefore § 922(g)(1)'s limitation thereon does not offend the Constitution. The Government states that "[l]egislatures historically have had wide latitude to exclude felons from the political community based on their convictions" by barring felons from voting, holding public office, and serving on juries, as well as by barring them from possessing firearms. *Id.* at 7 (citing THOMAS M. COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS WHICH REST UPON THE

LEGISLATIVE POWER OF THE STATES OF THE AMERICAN UNION 28–29 (1868) and AKHIL REED AMAR, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION 48 (1998)). Accordingly, the Government argues, the Second Amendment has historically been understood to "impos[e] a firearms-related disability 'as a legitimate consequence of a felony conviction.'" *Id.* (quoting *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 708 (6th Cir. 2016) (en banc) (Sutton, J., concurring in part)). The Government collects other cases that find support for limitations on firearm possession in history and Second Amendment scholarship. *Id.* at 7–8 (citing, inter alia, *United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010) (per curiam) (hereinafter "*Yancey*")).

Therefore, in the Government's view, the Supreme Court's references to "law-abiding" citizens when interpreting the Second Amendment in *Heller*—which several justices in the *Bruen* majority later repeated—incorporate this historical meaning; in other words, the Second Amendment's plain text has been understood to include a restriction on the possession of firearms by people convicted of felonies. *Id.* at 8–9 ("*Bruen* did not deviate from *Heller*'s principle that the right to bear arms belongs only to 'law-abiding, responsible citizens.'" (citing 142 S. Ct. at 2131)). The Government acknowledges that the Seventh Circuit in *United States v. Meza-Rodriguez* earlier stated that *Heller* did not purport to define the term "people" in the Second Amendment as referring only to law-abiding citizens. *Id.* at 9 (citing 798 F.3d 664, 669 (7th Cir. 2015) (hereinafter "*Meza-Rodriguez*")). But it argues that the *Bruen* court's later repetition of the same language from *Heller* was deliberate, thus watering down the significance of this passage from *Meza-Rodriguez*. *Id.* (citing *Atkinson*, 70 F.4th at 1023).

Defendant makes several arguments in reply, which the Court finds somewhat difficult to follow. He appears to argue that the Government's

Case 2:22-cr-00210-JPS   Filed 02/08/24   Page 15 of 33   Document 45

position either misstates the history or confuses the legal analysis, citing to then-Judge, now-Justice Amy Coney Barrett's dissent in *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting). ECF No. 43 at 6–7. Then-Judge Barrett "indicated . . . [that] such restrictions [on the rights of felons] applied to civic rights like voting and jury service, not to individual rights like the right to possess a gun." *Id.* at 7 (no pinpoint citation given); *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting). Defendant seems to invoke this portion of *Kanter* to argue that excluding felons from ordinary rights of citizenship such as voting and disqualifying them from firearm possession are categorically different propositions, not analogous ones as the Government suggests. Defendant also highlights that then-Judge Barrett acknowledged that felons have at times been dispossessed of their firearms but indicated that, historically, the inquiry was about dangerousness rather than the person's status as a felon. ECF No. 43 at 7 (no pinpoint citation given); *Kanter*, 919 F.3d at 451 (Barrett, J., dissenting). Finally, Defendant points out that the Government's cited cases interpreting the Second Amendment's text as incorporating a restriction on felon firearm possession—all of which, as noted above, incorporate at least some historical analysis—all predate *Bruen*, asserting baldly that they "are no longer applicable in a post-*Bruen* world." *Id.* at 8, 11. He does not explain the significance of this timeline or the merits of the cases themselves (is he suggesting that the historical analysis of the Second Amendment in those cases, or any historical analysis that predates *Bruen*, is wrong; if so, why?). Defendant does not discuss *Yancey* or *Meza-Rodriguez*.

Underdeveloped as Defendant's arguments may be, the Court cannot at this time adopt the Government's position that the plain text of the Second Amendment is consistent with felon firearm dispossession, or

Case 2:22-cr-00210-JPS   Filed 02/08/24   Page 16 of 33   Document 45

that either the Supreme Court or the Seventh Circuit has so held. The Court will go no further than to note that the issue is an open one, as evidenced by the below-discussed cases. And because the Court ultimately resolves Defendant's motion at the second step of the *Bruen* analysis, *see infra* Section 4.2, it will assume without deciding that Defendant is among "the people" covered by the Second Amendment.

*Yancey* and *Meza-Rodriguez* are not easily reconciled. The Seventh Circuit in *Yancey*, citing two law review articles and a historical treatise, stated that "most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" 621 F.3d at 684–85 (citing *United States v. Vongxay*, 594 F.3d 1111, 118 (9th Cir. 2010) and *United States v. Skoien*, 614 F.3d 638, 640–41 (7th Cir. 2010); *see also* Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 TENN. L. REV. 461, 480 (1995); Don B. Kates, Jr., *The Second Amendment: A Dialogue*, LAW & CONTEMP. PROBS., Winter 1986, at 143, 146 (1986); THOMAS M. COOLEY, A TREATISE ON CONSTITUTIONAL LIMITATIONS 29 (1868)). Relying on this logic, the Seventh Circuit upheld 18 U.S.C. § 922(g)(3), which prohibits habitual drug users from possessing firearms, against the defendant's Second Amendment challenge. *Id.* at 687.

Several years later in *Meza-Rodriguez*, however, the Seventh Circuit sent another message while addressing "whether unauthorized noncitizens . . . are among 'the people' on whom the [Second] Amendment bestows" the right of gun possession. 798 F.3d at 669. It found that *Heller*'s references to "law-abiding" citizens "did not reflect an attempt to define the term 'people,'" and concluded that this term "has the same meaning as it carries in other parts of the Bill of Rights," which offer some protections to

Case 2:22-cr-00210-JPS   Filed 02/08/24   Page 17 of 33   Document 45

unauthorized noncitizens. *Id.* at 669–70, 672. Accordingly, the defendant, an unauthorized noncitizen, was allowed to invoke a Second Amendment challenge to his conviction for unlawful firearm possession, but the challenge was nonetheless decided in the Government's favor under the pre-*Bruen* means-end test. *Id.* at 672–73.

The Seventh Circuit has not resolved the tension between these analyses; it has suggested that *Bruen* changes the analysis but has not explained how. *See Atkinson*, 70 F.4th at 1023 ("Although we analyzed the scope of the Second Amendment right before *Bruen*, we have not returned to the issue since then." (citing *Meza-Rodriguez*, 798 F.3d at 669–72)). But it has also acknowledged that the *Yancey* court *did* perform some historical analysis of the Second Amendment's text. *Kanter*, 919 F.3d at 445 ("Nor has the Seventh Circuit decided whether felons were historically outside the scope of the Second Amendment's protection . . . . [But] we have suggested that felons were not historically understood to have Second Amendment rights." (citing *Baer v. Lynch*, 636 F. App'x 695, 692 (7th Cir. 2016), *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010), *Skoien*, 614 F.3d at 640, and *Yancey*, 621 F.3d at 684–85)). If *Yancey*'s reasoning, *see* 621 F.3d at 684–85, does not qualify as an adequate analysis under *Bruen*, then the Seventh Circuit has not clarified what would.

The Government argues that even "*Atkinson* itself acknowledged[] [that] *Meza-Rodriguez* lacked the benefit of *Bruen*'s repeated use of the phrase 'law[-]abiding citizens.'" ECF No. 41 at 9 (citing *Atkinson*, 70 F.4th at 1023). The Court does need read the cited portion of *Atkinson* as discarding anything in *Meza-Rodriguez*; it says only that "*Bruen* left this complicated issue [of whether the plain text of the Second Amendment protects felon firearm possession] unresolved." *Atkinson*, 70 F.4th at 1023.

Case 2:22-cr-00210-JPS   Filed 02/08/24   Page 18 of 33   Document 45

Defendant and the Government each cite a handful of post-*Bruen* cases from outside the Seventh Circuit and urge the Court to follow the holdings in those cases. ECF No. 39 at 12–14 (Defendant's brief citing *Range v. Att'y Gen. U.S.*, 69 F.4th 96 (3d Cir. 2023) (en banc) (hereinafter "*Range*"), which found § 922(g)(1) unconstitutional as applied to the defendant, and *United States v. Bullock*, No. 3:18-CR-165-CWR-FKB, 2023 WL 4232309 (S.D. Miss. June 28, 2023), which held the same) (hereinafter "*Bullock*"); ECF No. 41 at 4–5 (Government's opposition brief stating that "post-*Bruen*, nearly every federal court to consider the issue has concluded that § 922(g)(1) remains constitutional") (citing *United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023) (hereinafter "*Jackson*"), which held the statute constitutional as applied to defendant; *United States v. Alaniz*, 69 F.4th 1124 (9th Cir. 2023) (hereinafter "*Alaniz*"), which upheld as constitutional United States Sentencing Guideline § 2D1.1(b)(1), which imposes a sentence enhancement for possessing a firearm in connection with an underlying drug offense; and two unpublished Fifth Circuit cases[7] upholding § 922(g)(1) as constitutional on plain error review where the defendants raised no Second Amendment challenge in the district courts); *id.* at 5–6 (generally citing *Range* and *Bullock* and noting each made "narrow" and "limited" holdings, and citing *Atkinson*, 70 F.4th at 1025 (Wood, J., dissenting)).

However, neither party does much to engage with the plain text analysis in any of those cases. For example, in *Range*, the Third Circuit sitting en banc engaged in a similar analysis as that in *Meza-Rodriguez*, reasoning that the meaning of "the people" did not change from one

---

[7]*United States v. Hickcox*, No. 22-50365, 2023 WL 3075054, at *1 (5th Cir. Apr. 25, 2023) and *United States v. Garza*, No. 22-51021, 2023 WL 4044442, at *1 (5th Cir. June 15, 2023).

provision of the Bill of Rights to another. 69 F.4th at 101–02. The court wrote that it "[saw] no reason to adopt an inconsistent reading of 'the people'" and ultimately concluded that felons were within the meaning of "the people" as that phrase is used in the Second Amendment. *Id.* But Defendant makes no mention of this analysis in *Range*, and the Government does not attempt to rebut it.[8] It should go without saying that a party wishing to make an argument should actually *make* it, rather than plopping down an authority before the Court and expecting the Court to determine on its own what parts of that authority the parties might believe are relevant.

Given the parties' lack of briefing on the plain-text analysis in any of the out-of-circuit authorities they offer, the Court will not do the parties' work for them and accordingly does not find it appropriate at this time to adopt any one of their proffered authorities. Moreover, in light of the Seventh Circuit's mixed signals in *Yancey*, *Meza-Rodriguez*, *Kanter*, and *Atkinson*, the Court does not find it appropriate to rule definitively on the question of whether "the people" in the Second Amendment includes felons. *See Johnson*, 2023 WL 7284848, at *3–5 (analyzing *Yancey*, *Meza-*

---

[8]Defendant attacks the persuasive and precedential value of some of the Government's proffered cases. He notes that the Eighth Circuit's decision in *Jackson* relied on the prior panel decision in *Range* and asserts that therefore *Jackson* was "essentially negated" when the Third Circuit sitting en banc overruled the prior panel decision. ECF No. 43 at 3–4. He argues that *Alaniz* is inapposite because it was not about § 922(g)(1) but rather about a sentencing enhancement to which Defendant is not subject in the instant case. *Id.* at 4–5. Finally, Defendant argues that the Wood dissent in *Atkinson* carries no weight because it is a dissent, but nevertheless asserts that his own citations to then-Judge Barrett's dissent in *Kanter* are acceptable because "Judge Barrett is now on the United States Supreme Court." *Id.* at 6–7. Defendant makes some fair points, but—again—he does not address the *reasoning* in the Government's cases or in the *Range* and *Bullock* cases he offers, nor does he make any attempt to convince the Court that those courts' plain-text analyses are correct or incorrect.

*Rodriguez,* and *Range,* and collecting district court decisions coming to opposite conclusions on whether the Second Amendment's plain text supports felon firearm dispossession).

The Court will note, however, that it is reluctant to dismiss *Heller* and *McDonald*'s statements, repeated in *Bruen,* that the Second Amendment's protections are not unqualified and that individuals who are not "law-abiding" may be restricted from possessing guns. *Heller,* 554 U.S. at 626; *McDonald,* 561 U.S. at 786; *Bruen,* 142 S. Ct at 2131 (quoting *Heller,* 554 U.S. at 635); *id.* at 2161 (Alito, J., concurring) (citing *Heller,* 554 at 635). When the highest court in the land makes specific word choices, and makes them repeatedly, the lower courts should listen. *Hardy,* 2023 WL 6795591, at *3 ("*Heller*'s statement—that the Second Amendment protects only law-abiding people—can no longer be considered a 'passing reference' by the Supreme Court . . . . [E]ven if such a principle is 'dicta,' the Supreme Court's continuous reaffirmations strongly signal that it is not something for lower courts to ignore.") (internal citations omitted).

The Court joins Judge Adelman in concluding that "[a]bsent further guidance from the Supreme Court," it is not clear "whether the reference to 'law-abiding citizens' [in *Heller* and *Bruen*] was meant to limit the coverage of the Second Amendment right or whether it was simply 'shorthand' meant to exclude groups that have historically been stripped of their Second Amendment rights*." Johnson*, 2023 WL 7284848, at *4 (noting a reluctance to "dismiss[] [the reference] as mere dicta") (citing *United States v. Rahimi*, 61 F.4th 443, 452 (5th Cir. 2023)).[9] Like Judge Adelman, the Court

---

[9]Magistrate Judge Joseph found the *Range* court's reasoning persuasive and followed it to find that the Second Amendment's plain text covered the defendant's conduct. *Denruyter,* 2023 WL 8098783, at *2–5. Judge Griesbach did not

will simply "assume, arguendo, that felons are covered by the text of the Second Amendment and proceed to the next step, keeping in mind that nothing the Court has said so far casts doubt on 'presumptively lawful regulatory measures' such as the 'longstanding prohibitions on the possession of firearms by felons.'" *Id.* at *5 (quoting *Heller*, 554 U.S. at 626–27 & n.26).

### 4.2 History and Tradition

The Court now moves to the second step of the *Bruen* analysis. To penalize Defendant for possessing a firearm, the Government must show that § 922(g)(1) "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127. As explained *supra* Section 3.3, historical tradition can be established through analogy. *Id.* at 2133. The key metrics in determining whether historical and modern firearm regulations are "relevantly similar" are "*how* and *why* the regulations burden a . . . citizen's right to armed self-defense." *Id.* at 2132–33 (emphases added).[10]

For the reasons stated below, the Court agrees with the Government that § 922(g)(1) is consistent with the history and tradition of the regulation of firearms in the United States, as *Bruen* requires. Defendant has offered very little of value in the debate (as explained below, at times he appears to

---

directly address the plain text inquiry in *Watson*, 2023 WL 6623774, at *3, but later in *Denruyter* adopted Magistrate Judge Joseph's report and recommendation, thereby endorsing her reasoning. 2023 WL 8081658, at *1–2 (adopting report and recommendation "for the reasons set forth" therein). Magistrate Judge Joseph's analysis is thorough and sound, but on the record and arguments currently before it, the Court will take a more guarded approach.

[10]The Court omits the *Bruen* court's use of the phrase "law-abiding" here in light of having earlier assumed without deciding that the Second Amendment guarantees people convicted of felonies the right to bear arms.

essentially concede the Government's points). The Government offers two Founding-era trends as analogous to present-day § 922(g)(1)'s ban on felon firearm possession, which the Court finds instructive. These trends show that § 922(g)(1) limits a felon's Second Amendment rights for a reason that is "relevantly similar" to those behind historical limitations on firearm possession. *Bruen*, 142 S. Ct. at 2132.

First, the Government argues that the statute is "analogous to . . . laws categorically disqualifying groups who were untrustworthy adherents to the law from possessing firearms." ECF No. 41 at 10. The Government provides examples of such laws from "English history dating from the 1600s, along with American colonial views leading up to the founding." *Id.* at 9–10 (quoting *Bruen*, 142 S. Ct. at 2127). In England, one such law prohibited "Catholics who refused to renounce their faith" from possessing firearms. *Id.* at 10 (citing *Range*, 69 F.4th at 121–22 (Krause, J., dissenting), and *Jackson*, 69 F.4th at 502). The Government contends that such laws were rooted in the "untrustworthiness" of the target group, rather than in the perceived dangerousness of its members. *Id.* The Government points out that these laws were consistent with other foundational documents, such as the 1689 English Bill of Rights, a "predecessor to the Second Amendment . . . [which] specified that '*Protestants* may have Arms for their Defence suitable to their Conditions *and as allowed by Law*." *Id.* at 11 (quoting 1 W. & M., Sess. 2, c. 2 in 6 *The Statutes of the Realm* 143 (1688); other citations omitted).

The Government then provides a number of Founding-era examples of such laws from colonial America. *Id.* at 11–13. It points out that Native Americans and Black people, as a category, were subject to "pervasive" disarmament policies. *Id.* at 11 (footnote omitted) (citing *Jackson*, 69 F.4th at

503 and *Range*, 69 F.4th at 122 n.50 (Krause, J., dissenting)). Further, even "full-fledged members of the political community . . . 'whom the authorities believed could not be trusted to obey the law'" were disarmed. *Id.* at 11–12 (quoting *Range*, 69 F.4th at 122 (Krause, J., dissenting)). This included "Catholics who refused to take a loyalty oath" and "those who failed to demonstrate loyalty to the emerging American government," and even extended to "pacifists" who would not take oaths because doing so violated their religious convictions. *Id.* at 12 (citing 7 THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA 35–39 (1820) (1756)) and 13 (citing *Range*, 69 F.4th at 125 (Krause, J., dissenting)). The Government again stresses that these limitations were based not on a person's dangerousness or "demonstrated . . . propensity for violence" but rather on a "conclu[sion] [that] their conduct evinced a willingness to disobey the law." *Id.* at 12 (citing *Range*, 69 F.4th at 123 (Krause, J., dissenting)).

In addition to disarmament laws, the Government points to "[t]he history behind the Second Amendment's adoption" as "provid[ing] additional persuasive evidence that the Founders understood the individual right to bear arms to be compatible" with some restrictions thereon. *Id.* at 14–15 (citing the proposed constitutional amendments from the Pennsylvania Antifederalists, the Massachusetts convention, and the New Hampshire convention). The language of these proposals—which explicitly conditioned disqualification from firearm possession on either unlawfulness or dangerousness—did not ultimately make its way into the Second Amendment as ratified. *See id.* at 14. However, the Government contends that this fact does not matter, as "it would have been 'obvious' to the founders that certain groups . . . could properly be subject to disarmament laws consistent with the '*preexisting* right' that was 'codified'

in the Second Amendment . . . ." *Id.* at 15 (quoting *Bruen*, 142 S. Ct. at 2127) (other citations omitted).

Second, the Government argues that § 922(g)(1) is comparable to "laws authorizing capital punishment and estate forfeiture for felonies." *Id.* at 10; *id.* at 15–17 (compiling examples of such laws). It stands to reason, in the Government's view, that laws imposing such drastic consequences on people who committed felonies could not have coexisted with laws or practices *permitting* felons to possess firearms. *Id.* at 17. The Government acknowledges that then-Judge Barrett's dissent in *Kanter* found this rationale unpersuasive, but it notes that even then-Judge Barrett recognized that felons forfeited *some* civil rights such as voting and jury service. *Id.* at 17–18 (citing *Kanter*, 919 F.3d at 458–62) (Barrett, J., dissenting). This recognition, coupled with the Supreme Court's repetition in *Bruen* of *Heller*'s reference to "law-abiding citizens," reflects an understanding that forfeiture of the right to firearm possession was an understood consequence of a felony conviction. *See id.*

Although the Government characterizes the historical rationale for felon disarmament as stemming from "threat[s] to the social order," it further contends that "a historical rationale for disarmament based on danger supplies another helpful analogue." *Id.* at 18–19 (citing *Jackson*, 69 F.4th at 502–05 ("[E]ither reading supports the constitutionality of § 922(g)(1) . . . .")).

In his opening brief, Defendant essentially concedes that § 922(g)(1) finds some historical foothold in this dangerousness-based rationale. Defendant relies on then-Judge Barrett's dissent in *Kanter* for the proposition that Founding-era history shows that legislatures did, in fact, strip individuals of their right to possess firearms, but only "when they

judged doing so was necessary to protect the public safety." ECF No. 39 at 8 (no pinpoint citations given). Defendant notes that *Kanter* found support in the historical record for *some* category-based restrictions on firearm possession—such as disarming "those who refused to swear an oath of allegiance" as well as enslaved people and Native Americans, as the Government pointed out—but that "neither the convention proposals nor historical practice supports a legislative power to categorically disarm felons simply because of their status as felons." *Id.* at 9 (citing *Kanter*, 919 F.3d at 457–58).

Nonetheless, in both then-Judge Barrett's and Defendant's view, § 922(g)(1) is "wildly overinclusive"—and inconsistent with the history of firearms regulation in the United States—because it applies to felons regardless of whether their underlying offenses threaten public safety or not. *Id.* Something more is required: "protection of public safety, threat to misuse a firearm, and dangerousness[] are the criteria for disarming . . . convicted felons." *Id.* at 10; *id.* at 14 ("The Seventh Circuit had cited *Bruen* for the proposition that some mid-19th Century statutes banned concealed carry, but . . . [s]urety statues applied only to those individuals likely to pose a threat, [and] even those individuals could carry weapons publicly after posting bond.") (citing *Atkinson*, 70 F.4th at 1021).[11]

---

[11]Defendant repeatedly cites the district court decision in *Bullock*, but largely for its summary of prior case law rather than its substantive historical analysis. *See* ECF No. 39 at 3 (citing 2023 WL 4232309 at *2 for the § 922(g)(1)'s year of enactment); *id.* at 4 (citing 2023 WL 4232309 at *6 for the text of the Second Amendment); *id.* at 5–6 (citing 2023 WL 4232309 at *7–8 for its citations to *Heller*); *id.* at 7–10 (citing 2023 WL 4232309 at *10–12 for its citations to *Kanter*); *id.* at 10–12 (citing 2023 WL 4232309 at *12–14 for its citations to *Bruen*). Defendant has only this to say of *Bullock*'s substantive analysis:

In his reply brief, Defendant does not challenge the historical evidence the Government has put forward, nor does he offer any competing evidence. His main argument is that the Government's cited authorities are of little persuasive or precedential value. *See supra* note 8 (summarizing Defendant's arguments); ECF No. 43 at 8 ("The primary basis for [the Government's] argument . . . is dissent opinions from various cases."); *id.* at 9–10 (attacking persuasive value of cases the Government cites because they predate *Bruen*); *id.* at 11 ("[T]he Government's pre-*Bruen* case law . . . [is] no longer applicable in a post-*Bruen* world."). He essentially concedes that the disqualification laws that the Government cites in defense of the constitutionality of § 922(g)(1) *do* have a historical basis, albeit on a different rationale than what the Government offers. *Id.* at 9 ("[S]uch laws are not different from the laws cited in Defendant's [opening brief]. [These] laws aimed to prohibit violence and the risk of public injury . . . . [and] had not been meant to simply disarm felons."); *id.* at 10 (stating that the "various state convention statements" that the Government cites "are consistent with the arguments in Defendant's [opening brief]").

Frankly, the Court is confused by Defendant's line of argument. Why would he concede that *any* rationale for § 922(g)(1) has a historical basis? And why would he concede that a dangerousness-based rationale for

---

> In that case, the District Court found that the Government had not met its burden of showing that there is a historical tradition of disarming either the violent or dangerous, much less Bullock. There had not been any historical analogue presented by the Government. In this case, the Court analyzed solely the submissions by the Government to make this conclusion and finding.

*Id.* at 14 (citing *Bullock*, 2023 WL 4232309 at *29–32; *see also* ECF No. 43 at 6 (Defendant's reply brief noting that *Bullock*'s holding was limited to the particular defendant in the case).

§ 922(g)(1) has historical validity while also attacking the precedential value of the Eighth Circuit's opinion in *Jackson*, which stated that such a rationale *would* "support[] the constitutionality" of the statute? 69 F.4th at 502 (validating "[e]ither reading" of § 922(g)(1)'s historical grounding—either lawmakers' "longstanding authority and discretion to disarm citizens who are . . . 'unwilling to obey the government and its laws, whether or not they had demonstrated a propensity for violence," *or* a "narrower" authority to limit firearm possession by individuals "deemed more dangerous than a typical law-abiding citizen" (quoting *Range v. Att'y Gen.*, 53 F.4th 262, 269 (3d Cir. 2022) (per curiam), *vacated on reh'g en banc*, 69 F.4th 96)). If anything, *Jackson* provides some support for the position Defendant has staked out in his briefing, but the Court also does not fully understand what Defendant hoped to accomplish by staking out this position to begin with.

In any event, the Court finds that the historical evidence the Government cites demonstrates that § 922(g)(1) is consistent with the history and tradition of firearms regulation in this nation, as *Bruen* requires. Defendant argues that § 922(g)(1) violates the Second Amendment because it penalizes felons based solely on their status as felons and that such status-based restrictions lack a historical pedigree. ECF No. 39 at 7–8. But the Government has shown that its proffered historical analogues are not simply status-based restrictions on firearm possession. Rather, the Government has shown a pattern of Founding-era enactments that disarmed people who belonged to groups believed to lack respect for, or be unwilling to conform their conduct to, the law. The Seventh Circuit has recognized that, as a group, "most felons are nonviolent, but someone with a felony conviction on his record is more likely than a nonfelon to engage in illegal and violent gun use." *Yancey*, 621 F.3d at 685 (citing *United States*

Case 2:22-cr-00210-JPS   Filed 02/08/24   Page 28 of 33   Document 45

*v. Lane*, 252 F.3d 905, 906 (7th Cir. 2001)); *see also* UNITED STATES SENTENCING COMM'N, RECIDIVISM AMONG VIOLENT OFFENDERS 30 (2019), [https://perma.cc/ZQ36-FDE5] (hereinafter " RECIDIVISM AMONG VIOLENT OFFENDERS") (finding that offenders whose "instant federal offense" was not violent but who "had been arrested for a violent offense in their criminal history" recidivated at a rate of 65.1 percent). The Court reads § 922(g)(1) as "burden[ing] . . . the right to armed self-defense" for a similar reason as that of past disqualification laws—to address the threat of *unlawful* use of a firearm. *Bruen*, 142 S. Ct. at 2133.

In the alternative, if the disqualification laws to which the Government refers were part of an effort to address a risk of dangerousness rather than a risk of unlawful behavior, § 922(g)(1) still passes constitutional muster because individuals convicted of felonies, or at least violent felonies, are more likely to use violence if they recidivate. *Yancey*, 621 F.3d at 685; RECIDIVISM AMONG VIOLENT OFFENDERS 35 ("Among the violent prior offenders who recidivated, assault was the single most common serious new charge . . . followed by public order crimes . . . ."). Accordingly, if § 922(g)(1) is understood as addressing the risk of danger that those convicted of felonies pose to their communities, then disqualification laws and constitutional proposals contemplating disarmament demonstrate a historical concern with the same risk.

It is true that the disqualification laws to which the Government points did not apply categorically to *felons*, but this is not what *Bruen* requires. 142 S. Ct. at 2133 ("[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*."). It is also true that many of the restrictions to which the Government refers are both offensive and manifestly

discriminatory and would, in all likelihood, not pass constitutional muster today. But the Court is not required to approve of past legislation in order to find it relevantly similar to the present analysis. The Court need only find that "these early laws restricting categories of persons considered either untrustworthy or dangerous demonstrates that 'Congress acted within the historical tradition when it enacted § 922(g)(1) . . . .'" *Denruyter*, 2023 WL 8098783, at *7 (quoting *Jackson*, 69 F.4th at 505–06).

The Government has satisfactorily demonstrated similarity between the "why" of historical and modern-day firearm regulations; it has also adequately shown that the means—the "how"—of past and present firearm regulations are analogous. *Bruen*, 142 S. Ct. at 2133 (instructing courts to look to "how and why the regulations burden a . . . citizen's right to armed self-defense" to determine whether historical precedents are relevantly similar to the challenged law). First, the Government's evidence of laws disarming those belonging to groups that were purportedly disposed toward unlawfulness or dangerousness demonstrates a historical precedent for *categorical* disarmament, as opposed to disarmament on a case-by-case basis (the latter of which Defendant appears to advocate for, *see infra* Section 4.3). Second, the Government's evidence of laws imposing harsh consequences on felons is relevantly similar to the means the Government now uses to restrict a felon's ability to carry a firearm for self-defense. That Founding-era governments saw fit to impose capital punishment and estate forfeiture on individuals convicted of felonies demonstrates that the Government, now, may use lesser means to burden an individual's Second Amendment right. Again, the Court's role is not to approve of the wisdom of such laws, but rather to determine whether they are sufficiently similar to sustain the historical basis of § 922(g)(1). The Court finds that they are.

Case 2:22-cr-00210-JPS   Filed 02/08/24   Page 30 of 33   Document 45

### 4.3    As-Applied Challenge

Finally, responding to Defendant's motion to dismiss as an as-applied challenge, the Government argues that determining whether the statute is constitutional does not "turn[] on individualized assessment," but even if it did, "Defendant has dangerous and violent prior felony convictions" and therefore "is among the class of individuals constitutionally prohibited from possessing firearms." ECF No. 41 at 20–21.

Despite dedicating a substantial portion of his brief to explaining why he is not dangerous, ECF No. 39 at 16–20, Defendant concedes that individual assessments of dangerousness are *not* the touchstone of the Second Amendment analysis. *See id.* at 21 ("[E]ven if dangerousness is a touchstone of a convicted felon's Second Amendment right to possess a firearm, the Government cannot meet its burden of showing that Defendant is not one of the people who has lost his Second Amendment right to possess a firearm for self defense . . . . [T]he [c]ourts have not determined that dangerousness is relevant to a convicted felon's right[] under *Bruen*[] to publicly possess a firearm for self defense.").

Because Defendant has conceded that he is asking the Court to do something that it is neither required nor authorized to do under present law, the Court will not further address this analysis. *See Atkinson*, 70 F.4th at 1023 ("[A]lthough Atkinson has shown some support for the idea that a group's 'dangerousness' is what mattered to the Founders, he does not provide much historical basis for individual assessments or for delineating between individuals who committed violent versus non-violent crimes.").[12]

---

[12]Defendant's past felony offenses include battery of an officer and fleeing from police officers as well as a federal drug charge. *See supra* Section 2. This indicates to the Court both a propensity to disobey the law and a risk of

Page 31 of 33

**5. CONCLUSION**

For the reasons stated above, Defendant's motion to dismiss the Indictment, ECF No. 28, will be denied. Additionally, Defendant's pro se submissions, ECF Nos. 42 and 44, will be stricken from the record. The Court will further direct the parties to confer and, on or before **February 22, 2024**, file a status update apprising the Court of further scheduling needs in this case (for example, whether Defendant's original plea agreement will stand, or whether the parties would request a status conference with the Court).

Accordingly,

**IT IS ORDERED** that Defendant Maurice Geonta Davis's motion to dismiss the Indictment, ECF No. 28, be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Defendant Maurice Geonta Davis's pro se submissions, ECF Nos. 42 and 44, be and the same are hereby **STRICKEN**; and

**IT IS FURTHER ORDERED** that on or before **February 22, 2024**, the parties shall file a status update as described herein.

---

committing violence toward others. His arguments downplay the gravity of his past offenses and therefore would likely be without merit if § 922(g)(1)'s constitutionality analysis as applied to Defendant *did* require an individual assessment of the danger he poses. *Cf. Watson*, 2023 WL 6623774, at *6 ("[*Range*'s] limited holding provides no support for Watson's as applied argument here. His 2013 conviction for Possession of Cocaine Base with Intent to Distribute, for which he was sentenced to twenty-seven months in federal prison, is more serious and more recent than Range's 1995 conviction for the misdemeanor charge of making false statement on a food stamp application, for which he received straight probation. Given the well-recognized connection between drug trafficking and guns, *see United States v. Ramirez*, 45 F.3d 1096, 1102 (7th Cir. 1995) ("this court has recognized that weapons are tools of the narcotics trade"), application of § 922(g)(1)'s prohibition in this case is constitutional as applied to Watson even if it may not be sustained in other applications.").

Dated at Milwaukee, Wisconsin, this 8th day of February, 2024.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge